IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| JANE DOE 12, JANE DOE 13, | § | |
| JANE DOE 14, and JANE DOE 15, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 6:17-CV-236-RP |
| | § | JURY TRIAL DEMANDED |
| BAYLOR UNIVERSITY, | § | |
| | § | |
| Defendant. | § | |

**ORDER**

Each of the four plaintiffs in this case allege that while they were students at Baylor

University they were sexually assaulted by another student, but when they sought assistance and

protection from Baylor, the school did nothing (or almost nothing) in response to their reports.

Plaintiffs allege that Baylor's failure to promptly and appropriately investigate and respond to

student sexual assaults substantially increased the risk of sexual assault for Plaintiffs and for all

female students at Baylor. They further allege that Baylor's own policies and selective conduct code

enforcement created a discriminatory environment for female students that fostered sexual

harassment and sexual assault and denied educational opportunities to Plaintiffs and other female

students. Plaintiffs seek to hold Baylor liable under Title IX of the Education Amendments of 1972

("Title IX"). Title IX provides that "[n]o person in the United States shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under

any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). (Am.

Compl., Dkt. 14).

Baylor moves to dismiss each Plaintiffs' claims. (Dkts. 20, 21, 22, 23). Baylor attempts to

disclaim liability by arguing that Plaintiffs' alleged assaults were outside of their control, (Def.'s Mot.

Dismiss Doe 12, Dkt. 20, at 6), that Baylor's investigations were not "clearly unreasonable," (*id.* at

12), and that Baylor's written policy prohibiting sex discrimination protects the university from certain claims under Title IX, (*id.* at 8). The Court disagrees.

At this stage of litigation, the Court considers only whether Plaintiffs' Complaint contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Among their claims, Plaintiffs allege that Baylor discouraged them from reporting their assaults, failed to adequately investigate each of the assaults, misled and lied to Plaintiffs about their options for reporting and accommodations, and obstructed Plaintiffs' access to medical and mental health treatment. They also allege that these practices chilled other students from reporting sexual harassment. Plaintiffs assert that Baylor's practices in handling their reports reflect the school's widespread practice of mishandling reports of peer sexual assault. They allege that Baylor and its highest officers permitted the creation of a campus environment "rife with sexual assault," (Am. Compl., Dkt. 14, at ¶ 23), that "substantially increased Plaintiffs' chances of being sexually assaulted," (*id.* at 1), and ultimately created a hostile educational environment that deprived Plaintiffs of a normal college education, educational opportunities, and future earning capacity, (*id.* at 45–46).

What Plaintiffs allege—a widespread pattern of discriminatory responses to female students' reports of sexual assault permitted by high-ranking, policy-setting Baylor officials—presents a serious and plausible claim to relief under Title IX. Even those Supreme Court justices who expressed skepticism regarding holding institutions liable under Title IX for sexual assaults of individual students have suggested that "a clear pattern of discriminatory enforcement of school rules could raise an inference that the school itself is discriminating." *Davis v. Monroe Cty. Bd. Educ.*, 526 U.S. 629, 683 (1999) (Kennedy, J., dissenting). In particular, they noted that a "school's failure to enforce its rules when the boys target the girls on a widespread level, day after day, may support an inference that the school's decision not to respond is itself based on gender" and thereby be actionable under Title IX. *Id.*

# I. STANDARD OF REVIEW

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the [plaintiffs'] grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

# II. FACTUAL BACKGROUND

Plaintiffs are four women who were students at Baylor at the time of the events at issue in this lawsuit. (Am. Compl., Dkt. 14, ¶¶ 1–4). Each Plaintiff alleges one or more sexual assaults by fellow Baylor students between 2012 and 2016, including assaults committed by members of the Baylor football team and one member of the Baylor rugby team. (*Id.* ¶¶ 85, 107–08). Each Plaintiff also alleges that she reported her assault to—and was met with an indifferent and inadequate response from—the Baylor Counseling Center, the Baylor police department, the Title IX office, or another student services office. (*Id.* ¶¶ 54, 80, 86, 96, 110, 140–43). Plaintiffs allege that "high-level, policy-setting" Baylor employees and officials "did not cause any change in the sexually hostile environment at the University" even after receiving numerous, detailed reports of sexual assault. (*Id.* ¶ 38–39). Instead, Plaintiffs allege that Baylor discouraged them from reporting their assaults, (*id.* ¶¶ 55–57, 81, 111, 180), failed to adequately investigate each of the assaults, (*id.* ¶¶ 31–32), misled and lied to Plaintiffs about their options for reporting and accommodations, (*id.* ¶ 40), and obstructed

Plaintiffs' access to medical and mental health treatment, (*id.* ¶¶ 44, 61–62, 81, 88, 158–61). Plaintiffs allege that Baylor's actions caused Plaintiffs profound psychological damage and distress and negatively affected their future relationships. (*Id.* ¶¶ 43–44).

Plaintiffs assert that Baylor's practices in handling their reports reflect the school's widespread practice of mishandling reports of peer sexual assault. They allege that Baylor permitted the creation of a campus condition "rife with sexual assault," (*id.* ¶ 23), that "substantially increased Plaintiffs' chances of being sexually assaulted," (*id.* at 1), chilled student reporting of sexual assault and harassment, (*id.* ¶ 36), and ultimately created a hostile educational environment that deprived Plaintiffs of a normal college education, educational opportunities, and future earning capabilities, (*id.* ¶¶ 45–46).

Specifically, each Plaintiff makes the following individual allegations:

Jane Doe 12 (or "Doe 12"), who enrolled at Baylor in 2014, alleges she was raped by another Baylor student in March 2016. (*Id.* ¶¶ 50, 69). She first reported to a friend shortly after the assault and then reported the assault to a professor approximately two weeks later. (*Id.* ¶¶ 51–52). After her professor reported the assault to the department head, "ultimately an email was sent informing Title IX." (*Id.* ¶¶ 52–53). She alleges that when she met with Baylor's Title IX office, the office staff misinformed her and concealed information about additional reporting options, accommodations available under Title IX, and the availability of investigatory actions that could be undertaken by the university. (*Id.* ¶¶ 54–56, 75). The office staff advised her that "reporting to the police would mean a 5 year investigation," which "could possibly derail per plans to study abroad," and that "if her assailant graduated prior to the conclusion of a police investigation, the University would not be able to punish him." (*Id.* ¶ 56). As a result, Jane Doe 12 "chose to go through Title IX only" and did not file a police report. (*Id.* ¶ 57). After she made this choice, her assigned Title IX investigator went on vacation, and her case went "untouched" for a week even after she contacted the office multiple

times. (*Id.* ¶ 58). Jane Doe 12 requested academic support and counseling through the Title IX office. (*Id.* ¶ 60). For several months following her assault, she experienced panic attacks and anxiety and was unable to be by herself. (*Id.* ¶ 59). She attempted to avoid her assailant, but fear of running into him caused her anxiety in public at all times. (*Id.*). The Title IX office referred her to "an outside counselor that did not take her insurance." (*Id.* ¶ 61). When she explained this, the Title IX office did not offer alternatives, and instead encouraged her "to keep the appointment to see 'if it worked out.'" (*Id.*). Jane Doe 12 could not afford the appointment and "had no choice but to cancel." (*Id.*). Baylor's Title IX office did not refer her to the Advocacy Center, which offered free counseling. (*Id.* ¶ 62). The Title IX office also communicated inaccurate information to her professors, which required Jane Doe 12 to meet with professors to explain her situation, causing embarrassment. (*Id.* ¶ 63). Before the assault, Jane Doe 12 was on the Dean's List and received academic scholarships. (*Id.* ¶ 65, 48). After the assault, she failed courses, received "incompletes" on her transcript, had to retake courses, and became ineligible to study abroad. (*Id.* ¶ 66). Her GPA dropped substantially. (*Id.* ¶ 60). She was required to delay her graduation and lost her academic scholarship. (*Id.* ¶ 66). This also increased her financial burden. (*Id.* ¶ 73). She successfully appealed the termination of her academic scholarship, but Baylor allowed her just one semester to improve her GPA in order to retain it. (*Id.* ¶ 74). When Jane Doe 12 informed Baylor's Title IX office of her struggles, they encouraged her to "move on, push through, and to get over it." (*Id.* ¶ 67). The Title IX office conducted an investigation and found Jane Doe 12's assailant responsible for sexual assault but "no meaningful action was taken." (*Id.* ¶ 67). The sole consequence for her assailant was a no-contact order for the duration of his time at Baylor. (*Id.*). When Jane Doe 12 appealed their decision, Baylor suspended her for three months. (*Id.* ¶ 70). Jane Doe 12 alleges that Baylor's lack of knowledgeable staff and inadequate Title IX office substantially impaired her higher education experience and severely impaired her physical and mental health. (*Id.* ¶ 76).

Jane Doe 13 (or "Doe 13"), who enrolled in Fall 2011, alleges she was sexually assaulted three times while she was a student at Baylor. (*Id.* ¶¶ 78, 84, 96). She was first assaulted by another Baylor student in April 2012. (*Id.* ¶¶ 78–79). She reported the assault to Baylor's Counseling Center in Fall 2012. (*Id.* ¶ 80). She alleges that the Baylor counselor she met with misinformed her and concealed information about additional reporting options, accommodations available under Title IX, and the availability of investigatory actions that could be undertaken by the university. (*Id.* ¶ 81). Baylor staff placed Jane Doe 13 in group counseling sessions "where discussions of retaliation against reporters of sexual harassment were common." (*Id.* ¶ 82). The Baylor counselor present failed to "correct these narratives," causing Jane Doe 13 "to fear further reporting her assault." (*Id.*). In the Fall of 2012, Jane Doe 13 was sexually assaulted a second time. (*Id.* ¶ 84).

The second assailant was a member of the Baylor rugby team. (*Id.* ¶ 85). She reported this to her counselor at the Baylor Counseling Center. (*Id.* ¶ 86). She alleges that Baylor staff again "manipulated [her] into not pursuing her rights." (*Id.* ¶ 77). She experienced heavy anxiety, depression, and post-traumatic stress disorder ("PTSD"). (*Id.* ¶¶ 91, 93). She was subject to repeated on-campus encounters with her assailants and experienced panic attacks each time. (*Id.* ¶ 87). She struggled with classes. (*Id.* ¶ 91). The Baylor Counseling Center was often "too busy" and did not have time available for her. (*Id.* ¶ 88). When the Center turned her away, "she would breakdown crying," and on one occasion "a nurse found her in tears unable to move." (*Id.*). Instead of receiving help with accommodations from the Title IX office, Jane Doe 13 sought academic accommodations on her own. (*Id.* ¶ 89). When she sought help from the Office of Access and Learning Accommodation, they requested academic accommodations for Jane Doe 13 by writing to her professors that she had "mental issues." (*Id.*). Jane Doe 13 "struggled in her course work," failed one class, and had to pay to take it a second time. (*Id.* ¶ 77). Her GPA fell "almost a point." (*Id.* ¶ 95).

Jane Doe 13 was sexually assaulted a third time when, "[d]espite reporting the second assault and her concerns regarding Assailant 16," Baylor permitted him "to follow her on a study abroad program" hosted by Baylor.[1] (*Id.* ¶ 96). Jane Doe 13 alleges that Baylor's failure to respond to sexual assaults fostered an environment that led to her assaults. (*Id.* ¶ 102). Before her assaults, Jane Doe 13 received several scholarships and was scheduled to graduate with a master's degree. (*Id.* ¶¶ 77, 99). Since her assaults, Jane Doe 13 has experienced "great mental distress" that interferes with her daily routine, lost eligibility for certain scholarships, and had to delay her graduation. (*Id.* ¶¶ 98–99). Jane Doe 13 alleges that Baylor's actions and inactions have caused her severe physical and mental health impairments that continue today. (*Id.* ¶ 102). She alleges that Baylor's lack of knowledgeable staff and the "non-existence" of a Title IX office substantially impaired her higher education experience and severely impaired her physical and mental health. (*Id.* ¶ 103).

Jane Doe 14 (or "Doe 14"), who enrolled at Baylor in Fall 2014, alleges she was sexually assaulted by two members of the Baylor football team in April 2016, at student housing owned by Baylor. (*Id.* ¶¶ 106–09). She reported the assaults to Baylor's Counseling Center, the Baylor Police Department, and the Title IX office. (*Id.* ¶ 110). She alleges that Baylor staff misled her about additional reporting options, accommodations available under Title IX, and the availability of investigatory actions that could be undertaken by the university. (*Id.* ¶ 111). She alleges that Baylor staff "manipulated [her] into not pursuing her rights." (*Id.* ¶ 112). When Jane Doe 14 explained her assault and requested academic accommodations from a professor, the professor "declined accommodations and told her that despite bad things happening, life still goes on." (*Id.* ¶ 113). After

---

[1] The Court construes the Amended Complaint to allege that Jane Doe 13 was sexually assaulted once by Assailant 14 and twice by Assailant 15. The Amended Complaint identifies three different assailants: Assailant 14 in April 2012, (*Id.* at ¶ 78), Assailant 15 in Fall 2012, (*Id.* at ¶ 84), and "Assailant 16" during a Baylor study abroad program, (*Id.* at ¶ 96). However, the Amended Complaint states that the assault during the study abroad program was a second assault by the second assailant. (*Id.* at ¶ 96). For this reason, the Court construes the reference to "Assailant 16" as a clerical error, and reads ¶ 96 as describing a second assault by Assailant 15. The identity of the alleged assailant does not alter Jane Doe 13's underlying factual claim: that even after she reported a sexual assault to Baylor staff and raised concerns about a specific fellow student, that student was permitted to participate on the same study abroad program. (*Id.*).

her assault, Jane Doe 14 was placed on academic probation and then advised that "she had to go to another institution of higher education before she would be allowed to continue her course of study at Baylor." (*Id.* ¶¶ 114, 117). Jane Doe 14 took classes elsewhere, but when she attempted to re-enroll, she found that Baylor Judicial Affairs had placed a hold on her account. (*Id.* ¶¶ 118, 121). She alleges that Baylor's stated reason for the hold—certain text messages she allegedly sent while she was not enrolled at Baylor—was pretextual, and that Baylor's real reason was to retaliate for reporting her sexual assault. (*Id.* ¶¶ 119–20, 124). Baylor allowed Jane Doe 14 to re-enroll, but has since charged her with misconduct under the university Code of Conduct. (*Id.* ¶¶ 128, 130). Since the assault, Jane Doe 14's academic performance has "significantly declined." (*Id.* ¶ 133). Jane Doe 14 remains "obligated on substantial student debt with little academic credit to show for it," (*Id.* ¶ 115), and she "continues to struggle mentally and physically." (*Id.* ¶ 132).

Jane Doe 15 (or "Doe 15"), who enrolled at Baylor in August 2014, alleges she was sexually assaulted by another student in February 2016. (*Id.* ¶¶ 134, 136). After the assault, she went to a local hospital, which completed a Sexual Assault Nurse Examiner ("SANE") exam. (*Id.* ¶ 137). Jane Doe 15 reported the assault to the Waco Police Department. (*Id.* ¶ 138). Three professors visited her, and one reported the assault to the Title IX office. (*Id.* ¶ 139). The day after the assault, Jane Doe 15 reported to the Baylor Police Department. (*Id.* ¶ 140). Jane Doe 15's parents also contacted the Baylor Police Department and the Baylor Chaplain, requesting assistance. (*Id.* ¶ 140). Jane Doe 15's father contacted then-Baylor President Kenneth Star. (*Id.* ¶ 141). The Title IX office reassured Jane Doe 15 that she would receive assistance with academic accommodations, counseling, relocation, and a protective order. (*Id.* ¶ 142). Jane Doe 15 was then repeatedly referred to Baylor staff who did not provide assistance. The Title IX office referred her to a chaplain to assist with housing, but he did not respond to repeated attempts to reach him. (*Id.* ¶¶ 144–45). She was referred to the Vice President for Student Life, Martha Lou Scott, who told Jane Doe 15 that her office could not do

anything to help and "told her that she should take advantage of having her mom in town." (*Id.* ¶ 143). Baylor staff also told Jane Doe 15 that her assailant would be suspended and that he would be arrested if he attempted to come to campus. (*Id.* ¶ 148). But when her assailant returned to campus, Baylor staff did not have him arrested and they did not warn Jane Doe 15 that he had returned to campus. (*Id.* ¶¶ 149–50). Baylor conducted an investigation and found her assailant responsible, but failed to inform Jane Doe 15 of the adjudication in a timely manner, which caused unnecessary emotional distress. (*Id.* ¶ 156). The Title IX office informed her that because the case was closed, they would not provide any other assistance to her "academically or otherwise." (*Id.* ¶ 157). Jane Doe 15 states that by Fall 2016, she was "left to navigate accommodations, protective orders and housing on her own." (*Id.* ¶ 147). Jane Doe 15 was harassed by other Baylor students and subjected to student retaliation, but Baylor took no steps to help her even after she informed them of the continued harassment. (*Id.* ¶¶ 152–54). She sought counseling from the Baylor Counseling Center, but was charged for her sessions after exhausting the seven free sessions allotted to her, until her mother intervened. (*Id.* ¶ 158). "At no point" did any Baylor staff refer her to the Advocacy Center, which offered free counseling. (*Id.* ¶ 159). Instead, the Baylor Counseling Center often advised Jane Doe 15 that they were "too busy" to schedule appointments, and her assigned counselor "often cancelled appointments without rescheduling." (*Id.* ¶¶ 160–61). For several months following the assault, Jane Doe 15 was "unable to be by herself" and experienced panic attacks and anxiety. (*Id.* ¶ 167). After her counselor, Patty Crawford, resigned from her role at Baylor in Fall 2016, Jane Doe 15 was "unable to cope and suicidal." (*Id.* ¶ 163). When Jane Doe 15 informed Baylor's Title IX office of her struggles, they encouraged her to "move on, push through, and to get over it." (*Id.* ¶ 168). Although Jane Doe 15 held academic scholarships prior to her assault, her experience since the assault has required her to delay graduation. (*Id.* ¶¶ 135, 164). Since her assault, Jane Doe 15 has experienced great mental distress that interferes with her daily routine and has hindered her ability to

find work post-graduation. (*Id.* ¶ 170). Jane Doe 15 alleges that Baylor's actions and inactions have caused her severe physical and mental health impairments that continue today. (*Id.* ¶ 172). She alleges that Baylor's lack of knowledgeable staff and the "non-existence" of a Title IX office substantially impaired her higher education experience and severely impaired her physical and mental health. (*Id.* ¶ 173).

In addition to the specific facts alleged above, Plaintiffs note that Baylor did not have a full-time Title IX coordinator until November 2014. (*Id.* ¶ 42). Moreover, despite the assaults reported to Baylor by Plaintiffs and others, Baylor claimed to the U.S. Department of Education that zero incidents of sexual assault took place on its campus between 2008 and 2011.[2] (*Id.* ¶ 35).

## III. TITLE IX

Title IX of the Education Amendments of 1972 prohibits discrimination on the basis of sex in all federally-funded educational programs. 20 U.S.C. § 1681(a). Specifically, it provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

*Id.* When Congress first passed Title IX more than forty years ago, it had two related objectives: first, Congress wanted to prevent federal funds from being used to support discriminatory practices; second, it wanted to provide individuals "effective protection against those practices." *Cannon v. Univ. Chic.*, 441 U.S. 677, 704 (1979); *see also* 118 Cong. Rec. 5730 (1972) (statement of Senator Birch Bayh) ("The amendment we are debating is a strong and comprehensive measure which I believe is needed if we are to provide women with solid legal protection as they seek education and training for later careers. . . . As a matter of principle, our national policy should prohibit sex discrimination

---

[2] The alleged assaults at issue in the instant case took place between April 2012 and November 2014. (Am. Compl., Dkt. 14, ¶¶ 50, 78, 84, 96, 106, 136; *see also infra*, n. 12). Furthermore, as noted on a website cited by Plaintiffs in the Amended Complaint, a Baylor student was criminally charged with the sexual assault of a fellow student in May 2011. Waco Tribune-Herald, *Timeline: Baylor Sexual Assault Controversy*, http://www.wacotrib.com/news/higher_education/timeline-baylor-sexual-assault-controversy/article_abf21ab8-2267-51bf-84d8-6268f4222af0.htm. (*Id.* at ¶ 22).

at all levels of education."). When private universities like Baylor accept funding through various federal programs, such as enrolling students who receive federal funds to pay for their education, they become subject to the requirements of Title IX. *See Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 466 (1999).

Title IX is enforceable through an individual's private right of action and allows for the recovery of damages. *Davis*, 526 U.S. at 639 (citing *Cannon*, 441 U.S. 607 and *Franklin v. Gwinnett Cty. Public Schs.*, 503 U.S. 60 (1992)). The recognition of this private right of action has given rise to two general avenues for Title IX claims. The distinction between these two avenues—one for claims based on an official policy of discrimination and another for claims based on an institution's actual notice of and deliberate indifference to sexual harassment or assault—is particularly relevant here because Plaintiffs use both to advance their claims.

The first avenue for claims under Title IX is based on institution's official policy of intentional discrimination.[3] *See Franklin*, 503 U.S. at 75 (distinguishing claims alleging "intentional discrimination" by an institution from those claims seeking to hold an institution liable for the discriminatory acts of an individual); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) (distinguishing claims involving an "official policy" of discrimination from those seeking to hold an institution liable for the discriminatory acts of an individual). These claims typically allege a policy of sex discrimination by a school or university in admissions, scholarship administration, or athletic

---

[3] Neither the Fifth Circuit nor the Supreme Court has directly addressed whether discrimination must be intentional to sustain a private right of action under Title IX. The Supreme Court has concluded, however, that Title VI, on which Title IX is patterned, prohibits only intentional discrimination. *See Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001); *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th Cir. 2015). Most courts that have considered whether Title IX allows a disparate impact claim have held that it does not. *See, e.g., Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 946 (D.C. Cir. 2004), *abrogated on other grounds by Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017); *Manley v. Tex. Southern Univ.*, 107 F. Supp. 3d 712, 726 (S.D. Tex. 2015); *Weser v. Glen*, 190 F. Supp. 2d 384, 395 (E.D.N.Y. 2002), *aff'd*, 41 F. App'x 521 (2d Cir. 2002). Here, while Plaintiffs state that Baylor's actions had a disparate impact on female students at Baylor, including Plaintiffs, they also repeatedly allege that Baylor's actions "stem from discriminatory intent." (*See, e.g.*, Pl.'s Resp. Doe 12, Dkt. 25, at 18; Pl.'s Resp. Doe 14, Dkt. 27, at 18; *see also* Pl.'s Resp. Doe 12, Dkt. 25, at 11 ("Baylor remains intentionally hostile (not just deliberately indifferent) to reports from students who are raped.")). The Court therefore presumes without deciding that intentional discrimination is required for a Title IX claim.

programing.[4] *See, e.g.*, *Pederson v. La. State Univ.*, 213 F.3d 858, 879–82 (5th Cir. 2000) (identifying an intentional violation of Title IX after a university disbanded the women's fast-pitch softball team, despite female students' interest and ability in the sport, and noting that the proper test an intentional violation is whether an institution "intended to treat [students] differently on the basis of their sex").

The second avenue for Title IX claims is typically used for claims of sexual harassment or assault. The Supreme Court has held that sexual harassment within a school or school program is a form of sex discrimination when the harassment is "so severe, pervasive, and objectively offensive" that it deprives the victim of educational opportunities or benefits provided by the school. *Davis*, 526 U.S. at 650. A school can be held liable for such harassment when it is deliberately indifferent to harassment of which it has actual knowledge. *Id.* This is true regardless of whether the harasser is an employee of the school or another student, but liability under this avenue is limited to circumstances in which the school "exercises substantial control over both the harasser and the context" in which the harassment occurs. *Id.* at 645. This framework for liability in sexual harassment cases ultimately serves as a proxy for the showing of intentional discrimination that is otherwise required for Title IX claims. Thus, while the school is not itself committing the sexual harassment, it can be said to be intentionally discriminating if it knows of severe and pervasive sexual harassment occurring within its control and, for example, does nothing. *Gebser*, 524 U.S. at 290.

It is with these two avenues in mind that the Court now turns to consider Plaintiffs' claims. First, Plaintiffs here allege what might be considered a "traditional" claim for sexual assault under Title IX. They each argue that they were sexually assaulted by a peer at Baylor, that they reported their assault to the university, and that Baylor's deliberately indifferent response to each of their

---

[4] Employment claims against a school, such as a claim for retaliation made by an individual who complains about sex discrimination, also fall into this category. *See, e.g.*, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005).

reports deprived them of educational opportunities and benefits provided by the school. The Court will refer to these as Plaintiffs' "post-reporting claims."

Second, Plaintiffs allege that even before their initial reports of sexual assault, Baylor's discriminatory practices in handling reports of sexual assault—discouraging victims from reporting their assaults and failing to investigate their claims or punish their assailants—constituted a policy of intentional discrimination that substantially increased Plaintiffs' risk of being sexually assaulted. The Court will refer to these as Plaintiffs' "heightened-risk claims."

Baylor moves to dismiss all of Plaintiffs' Title IX claims. The Court will first address whether Plaintiffs have plausibly alleged each of these claims and then consider whether any plausibly alleged claim is barred by the applicable statute of limitations.

## A. Post-Reporting Sexual Harassment or Assault

Each Plaintiff alleges that Baylor was deliberately indifferent to her reports of sexual assault, thereby causing her further sexual assault or harassment or creating a hostile educational environment. As the Court previously explained, under Title IX, a school "may be liable for failing to address student-on-student sexual harassment 'only where [the school is] deliberately indifferent to . . . harassment, of which [it has] actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.'" *Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 995 (5th Cir. 2014) (quoting *Davis*, 526 U.S. at 650). For the school to have "actual knowledge" of harassment, an "appropriate person"—"an official of the recipient entity with authority to take corrective action"—must have both actual knowledge of the harassment and an "opportunity to rectify any violation." *Gebser*, 524 U.S. at 290. Further, liability is limited "to circumstances where[] the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645. Finally, the "harassment must have a 'concrete,

negative effect' on the victims' education, such as creating [a] 'disparately hostile educational environment relative to [the victim's] peer,' forcing the student to change his or her study habits or to move to another [school], or lowering the student's grades.'" *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 410 (5th Cir. 2015) (citations omitted) (applying *Davis* in a Title VI case involving race-based student-on-student harassment).

Baylor makes three primary arguments that Plaintiffs' allegations are insufficient to state a claim for liability. First, Baylor argues that Plaintiffs' post-reporting claims fail as a matter of law because Baylor's investigations were prompt and responsive. (*See* Def.'s Mot. Dismiss Doe 12, Dkt. 20, at 12–15; Def.'s Mot. Dismiss Doe 14, Dkt. 22, at 13–15; Def.'s Mot. Dismiss Doe 15, Dkt. 23, at 13–15). Baylor argues that the university's response was not "clearly unreasonable." *Davis*, 526 U.S. at 648 ("[F]unding recipients are deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances."). Baylor is correct that Title IX does not require universities to "ensure that . . . students conform their conduct" to university rules, *Davis*, 526 U.S. at 648, and that Title IX does not mandate a "particular remedial action." *K. S. v. Nw. Indep. Sch. Dist.*, 689 F. App'x 780, 784 (5th Cir. 2017) (citing *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 168 (5th Cir. 2011)). To satisfy Title IX, a university "must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Davis*, 526 U.S. at 649. Although Baylor contends that its investigations were prompt and reasonable, Plaintiffs allege facts which, assumed to be true, would demonstrate otherwise. Plaintiffs allege that when they reported that they had been raped, Baylor discouraged them from reporting their assaults, (Am. Compl., Dkt. 14, ¶¶ 55–57, 81, 111, 180), failed to adequately investigate each of the assaults, (*id.* ¶¶ 31–32), misled and lied to Plaintiffs about their options for reporting and accommodations, (*id.* ¶¶ 40, 54–56, 75, 111–112), and obstructed Plaintiffs' access to medical and mental health treatment, (*id.* ¶¶ 44, 61–62, 81,

88, 158–61). The Court finds that these facts allege a plausible claim that Baylor's response to Plaintiffs' reports was clearly unreasonable.[5]

Next, Baylor argues that the university was not required to deliver any particular accommodation or remedy for Plaintiffs after they reported their assaults. (Def.'s Mot. Dismiss Doe 12, Dkt. 20, at 15; Def.'s Mot. Dismiss Doe 14, Dkt. 22, at 15; Def.'s Mot. Dismiss Doe 15, Dkt. 23, at 17). Baylor's analogy of Plaintiffs' claims to "demanding a new desk assignment" profoundly understates the seriousness of Plaintiffs' claims. (Def.'s Mot. Dismiss Doe 12, Dkt. 20, at 16; Def.'s Mot. Dismiss Doe 14, Dkt. 22, at 14; Def.'s Mot. Dismiss Doe 15, Dkt. 23, at 16). Plaintiffs argue that Baylor's actions and inactions after they reported their assaults denied Plaintiffs the benefits of, and subjected them to discrimination in their education at Baylor on the basis of their sex. (Am. Compl., Dkt. 14, at ¶ 177). Specifically, Plaintiffs allege that even after receiving detailed, numerous reports of sexual assault, "high-level, policy-setting" Baylor employees and officials "did not cause any change in the sexually hostile environment at the University." (*Id.* ¶¶ 38–39). Instead, Plaintiffs allege that Baylor discouraged them from reporting their assaults, (*id.*, at ¶¶ 55–57, 81, 111, 180), failed to adequately investigate each of the assaults, (*id.* ¶¶ 31–32), misled and lied to Plaintiffs about their options for reporting and accommodations, (*id.* ¶ 40), and obstructed Plaintiffs' access to medical and mental health treatment, (*id.* ¶¶ 44, 61–62, 81, 88, 158–61). Taken together, Plaintiffs

---

[5] Baylor argues that Plaintiffs have failed to allege that an "appropriate person" at Baylor obtained "actual knowledge" of their harassment. (*See, e.g.,* Mot. Dismiss Doe 13, Dkt. 21, at 5–8). However, each Plaintiff alleges she reported her assault or assaults to the Baylor counseling center, the Baylor police department, the Title IX office, or another student services office. (*Id.* ¶¶ 54, 80, 86, 96, 110, 140–43). Determining whether, from these reports, an official with the ability to take corrective action learned of the assaults is necessarily a fact-intensive inquiry. See *Doe v. Sch. Bd. of Broward Cty.*, 604 F.3d 1248, 1256 (11th Cir. 2010) ("[T]he ultimate question of who is an appropriate person is 'necessarily a fact-based inquiry' because 'officials' roles vary among school[s].'"). At this stage, the Court finds it plausible that these personnel were "appropriate persons" pursuant to Title IX or that such personnel communicated Plaintiff's reports to an "appropriate person," which raises her right to relief "above the speculative level." *Twombly*, 550 U.S. at 555. Regardless, Plaintiff is not obligated to demonstrate actual notice in order to survive a motion to dismiss because Plaintiff's action is based on an alleged official policy of discrimination at Baylor. *See Gebser*, 524 U.S. at 290 (stating that the actual notice and deliberate indifference requirements are restricted to those cases "that do not involve [an] official policy of the [funding recipient]"); *Davis*, 526 U.S. at 642 (acknowledging that an institution cannot be liable unless it has notice that its conduct could subject it to a damages claim but providing that "this limitation . . . is not a bar to liability where a funding recipient intentionally violates the statute").

allege, these facts demonstrate that Baylor created a hostile educational environment that deprived Plaintiffs of a normal college education, educational opportunities, and future earning capabilities, (*id.* ¶¶ 45–46). Baylor attempts to dismiss these allegations as a list of "remedial demands." (Def.'s Mot. Dismiss Doe 12, Dkt. 20, at 16 (citing *Davis*, 526 U.S. at 648 (making clear that victims of peer harassment do not "have a Title IX right to make particular remedial demands"))). However, Plaintiffs do not assert a "'stand-alone claim" for particular remedies or accommodations. (Reply Doe 12, Dkt. 29, at 9). Rather, Plaintiffs present these allegations as a body of evidence to show "that Baylor's response to the alleged assault[s] was clearly unreasonable." (*Id.* (citing *Davis*, 526 U.S. at 648)). At this stage, the Court finds that these facts allege a plausible claim that when Plaintiffs reported sexual assault, Baylor's response was clearly unreasonable.

Finally, Baylor argues that Plaintiffs failed to plausibly allege they were subjected to "further" harassment after reporting their initial sexual assault(s), especially for those Plaintiffs who do not allege that specific instances of assault or harassment took place after they reported their initial assault(s).[6] (Def.'s Mot. Dismiss Doe 12, Dkt. 20, at 15; Def.'s Mot. Dismiss Doe 14, Dkt. 22, at 15; Def.'s Mot. Dismiss Doe 15, Dkt. 23, at 17). While allegations of further assault or harassment are necessary for a claim under Title IX, the Supreme Court has made clear that to "subject" a student to harassment a school need only make the student vulnerable to that harassment. *Davis*, 526 U.S. at 645. Thus, discriminatory harm can include the harm faced by student-victims who are rendered vulnerable to future harassment and either leave school or remain at school and endure an educational environment that constantly exposes them to a potential encounter with their harasser or assailant. *See, e.g.*, *Jane Doe 1, et al. v. Baylor Univ.*, 240 F. Supp. 3d 646, 660 (W.D. Tex. 2017); *see*

---

[6] Only Jane Doe 13 specifically alleges that Baylor had knowledge of accusations against her specific assailant prior to her third assault. In addition to the Plaintiffs' primary claim that Baylor was deliberately indifferent to their reports of sexual assault and that the university maintained an official policy of discrimination that increased Plaintiffs' risk of sexual assault, Jane Doe 13 alleges that she was sexually assaulted a third time when, "[d]espite reporting the second assault and her concerns regarding [the assailant]," Baylor "allowed [him] to follow her on a study abroad program" hosted by Baylor. (Compl., Dkt. 14, at ¶ 96). *See, infra*, n. 2.

*also Karasek v. Regents of the Univ. of Cal.*, No. 15-CV-03717, 2015 WL 8527338, at *12 (N.D. Cal. Dec. 11, 2015) (holding that a plaintiff may state a Title IX claim "even in the absence of any further affirmative acts of harassment" and noting that requiring otherwise "runs counter to the goals of Title IX"); *Takla v. Regents of the Univ. of Cal.*, No. 2:15–CV–04418, 2015 WL 6755190, at *5 (C.D. Cal. Nov. 2, 2015) ("[P]lacing undue emphasis on whether further harassment actually occurred to gauge the responsiveness of an educational institution would penalize a sexual harassment victim who takes steps to avoid the offending environment."); *Kelly v. Yale Univ.*, No. CIV.A. 3:01-CV-1591, 2003 WL 1563424, at *3–4 (D. Conn. Mar. 26, 2003) ("[A] reasonable jury could conclude that further encounters, of any sort, between a rape victim and her attacker could create an environment sufficiently hostile to deprive the victim of access to educational opportunities provided by a university.").

For example, in *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282 (11th Cir. 2007), the Eleventh Circuit held that the plaintiff-victim's immediate withdrawal from the University of Georgia—after being gang-raped in one of the student-rapists' dorm rooms—did not "foreclose her argument that [the university] continued to subject her to discrimination." *Id.* at 1297. This discrimination took the form of the university's failure to "take any precautions that would prevent future attacks from [the plaintiff's rapists] or like-minded hooligans should [the plaintiff] have decided to return," which "effectively den[ied] [her] the opportunity to continue to attend [the school]." *Id.*

In light of its general rejection of Baylor's arguments, the Court finds that each Plaintiff in the instant case has plausibly alleged that Baylor was deliberately indifferent to her report(s) of sexual assault, depriving her of educational opportunities to which she was entitled. First, each Plaintiff plausibly alleges that while she was at Baylor, she was sexually assaulted by another student. (Am. Compl., Dkt. 14., ¶¶ 50, 68, 78–79, 84–85, 96, 136). Second, each Plaintiff alleges she reported

her assault or assaults to the Baylor counseling center, the Baylor police department, the Title IX office, or another student services office. (*Id.* ¶¶ 54, 80, 86, 96, 110, 140–43). Third, each Plaintiff alleges that Baylor did nothing (or almost nothing) in response to the reports of sexual assault. (*Id.* ¶¶ 60–63, 68–72, 87–90, 92, 113–14, 143–51, 153–57, 159–61, 168–69). Each Plaintiff also alleges that "high-level, policy-setting" Baylor employees and officials received detailed, numerous reports of sexual assault, but still "did not cause any change in the sexually hostile environment at the University." (*Id.* ¶¶ 38–39). Instead, each Plaintiff alleges Baylor discouraged her from reporting her assault(s), (*id.* ¶¶ 55–57, 81, 111, 180), misled and lied to Plaintiffs about their options for reporting and accommodations, (*id.* ¶¶ 40, 75, 81, 111, 146–49), and obstructed Plaintiffs' access to medical and mental health treatment, (*id.* ¶¶ 44, 61–62, 81, 88, 158–61). Each Plaintiff also alleges that Baylor failed to adequately investigate each of the assaults, and failed to take steps to ensure she would not be subject to continuing assault and harassment. (*Id.* ¶¶ 31–32, 59, 68–70, 81, 84, 96, 111–12, 147–56). Finally, each Plaintiff alleges concrete harms caused by Baylor's inadequate response, such as a decline in grades, the loss of scholarships, delayed graduation, severe anxiety, or depression. (*Id.* ¶¶ 43–46, 59, 64–66, 73–74, 87–88, 91, 93–95, 97–99, 102, 114, 117, 132–33, 151, 154, 163–65, 167, 170, 172).

## B. Heightened Risk of Sexual Harassment or Assault

Plaintiffs also claim that Baylor's handling of reports of sexual assaults created a heightened risk of sexual assault throughout the university's student body. Plaintiffs allege Baylor knew of and permitted a "campus condition rife with sexual assault," (Am. Compl., Dkt. 14, ¶ 23); that sexual assault was "rampant" on Baylor's campus, (*id.* ¶ 21); and that "high-level, policy-setting" Baylor employees and officials "did not cause any change in the sexually hostile environment at the University" even after receiving detailed, numerous reports of sexual assault, (*id.* ¶¶ 38–39). Plaintiffs allege that Baylor's failure to properly investigate sexual assaults chilled reporting and "substantially

increased" the risk that Plaintiffs and others would be sexually assaulted. (*Id.* at 1; ¶ 36). Further, they allege that Baylor engaged in "a pattern and practice of behavior designed to discourage and dissuade students . . . who had been sexually assaulted from seeking prosecution and protection." (*Id.* ¶ 180). They assert that "this policy . . . constituted disparate treatment of females and had a disparate impact on female students." (*Id.* ¶ 181).

The Supreme Court has repeatedly explained that where the Title IX violation in question is caused by an institution's discriminatory policy or custom, courts need not apply the actual notice and deliberate indifference framework typically used in cases involving institutional liability for sexual harassment or assault. *See Gebser*, 524 U.S. at 290 (stating that the actual notice and deliberate indifference requirements are restricted to those cases "that do not involve [an] official policy of the [funding recipient]"); *Davis*, 526 U.S. at 642 (acknowledging that an institution cannot be liable unless it has notice that its conduct could subject it to a damages claim but providing that "this limitation . . . is not a bar to liability where a funding recipient intentionally violates the statute"). Plaintiff's heightened-risk claims fit squarely within the official-policy rubric previously identified by the Supreme Court, and this Court is satisfied that Plaintiffs have met their burden under Rule 12(b)(6).

In evaluating such claims, courts must consider whether the defendant-institution's policy or custom inflicted the alleged injury. *See Gebser*, 524 U.S. at 291 (locating an analogue to the Title IX jurisprudence in the municipal liability doctrine); *see also Bd. Cty. Comm'rs Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997) (explaining that plaintiffs seeking to impose liability on a municipality under § 1983 "must 'identify a municipal 'policy' or 'custom' that caused the plaintiff's injury"); *Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992) (noting the necessity of analyzing whether execution of a municipal policy inflicted the injury). The Tenth Circuit overturned a lower court's grant of summary judgment on this basis, permitting plaintiffs to attempt to show at trial that the University

of Colorado at Boulder was liable because their sexual assaults "arose out of an official school program" and were a natural consequence of that program. *Simpson v. Univ. Colo. Boulder*, 500 F.3d 1170, 1174–75 (2007).

The Court remains sensitive to concerns that application of the official policy rubric to claims involving a school-wide risk of sexual assault may be taken to imply that higher education institutions, due to the prevalence of sexual assault among college-aged individuals, would face near-constant liability. It is an unfortunate truth that one could "anticipate that the very operation of a school would be accompanied by sexual harassment." *Simpson*, 500 F.3d at 1177. But the official-policy rubric's extension of liability is limited by its demand that plaintiffs demonstrate the misconduct complained of was "not simply misconduct that happened to occur [at the school] among its students," *id.* at 1174, but was in fact caused by an official policy or custom of the university. Liability cannot be based, for example, solely on a funding-recipient's "failure to promulgate and publicize an effective policy and grievance procedure for sexual harassment claims." *Gebser*, 524 U.S. at 291.

Baylor makes several arguments that Plaintiffs' allegations are insufficient to state a claim under this framework. First, Baylor argues that Plaintiffs have not alleged facts to show that Baylor had substantial control over the alleged assailants at the time of the alleged assaults.[7] Under Title IX,

---

[7] Baylor argues that Jane Doe 12 alleges no facts to show substantial control because "she never alleges that her assault occurred during a program or activity of the university or that Baylor had control over the accused student at the time of the assault." (Mot. Dismiss Doe 12, Dkt. 20, at 6). Baylor argues that Jane Doe 13 has failed to plead facts showing substantial control because the complaint "never identifies the location or the context" of the first two sexual assaults she alleges by Baylor students. (Mot. Dismiss Doe 13, Dkt. 21, at 9). Regarding the third sexual assault Jane Doe 13 alleges, Baylor incorrectly states that "there are no allegations that Baylor had actual knowledge that the male student posed a substantial risk of engaging in sexual misconduct and that Baylor responded with deliberate indifference." (*Id.* at 10). The Court disregards this argument because Jane Doe 13 pleads in her complaint: "Despite reporting the second assault and her concerns regarding [her second assailant]," Baylor permitted him "to follow her on a study abroad program" hosted by Baylor. (Am. Compl., Dkt. 14, at ¶ 96). Regarding Jane Doe 14, Baylor argues that although she alleges she was assaulted by two football players in student housing owned by Baylor, "she never alleges that Baylor controlled, supervised, or even knew about the activities occurring in the private residence," (Mot. Dismiss Doe 14, Dkt. 22, at 5), and "a university does not exercise control over its athletes at all times and in all situations," (*Id.*). Baylor argues that Jane Doe 15 has not pled facts showing substantial control because the alleged assault occurred off-campus. (Mot. Dismiss Doe 15, Dkt. 23, at 6).

"[i]f a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment." *Davis*, 526 U.S. at 644 (citing 20 U.S.C. § 1681). "Moreover, because the harassment must occur 'under' 'the operations of' a [funding] recipient . . . the harassment must take place in a context subject to the school district's control." *Davis*, 526 U.S. at 645 (citing 20 U.S.C. §§ 1681(a); 1687 (defining "program or activity")). The Supreme Court concluded that "[t]hese factors combine to limit a recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645. Baylor argues that Plaintiffs have failed to allege facts to establish that the university had substantial control over the off-campus sexual assaults, or that Baylor had substantial control over the accused student(s) at the time of the assault(s). (*See* Mot. Dismiss Doe 12, Dkt. 20, at 5–6). Baylor asserts that this defeats Plaintiffs' post-reporting and heightened risk claims. (*Id.* at 5 (citing *Weckhorst v. Kansas State Univ.*, 2017 WL 3674963, at *6 (D. Kan., Aug. 24, 2017); *Roskin-Frazee v. Columbia Univ.*, 2018 WL 1166634, at *5 (S.D.N.Y., Feb. 21, 2018))). However, the plaintiffs in those cases had not stated a plausible "official policy" claim, as this Court finds Plaintiffs do here, *infra* at 23–24. *See Weckhorst*, 2017 WL 3674963, at *8; *Roskin-Frazee*, 2018 WL 1166634, at *5. Moreover, *Weckhorst* found that the first plaintiff *did* state a plausible claim that the university had substantial control over an off-campus assault, even in the absence of an official policy claim. *Weckhorst*, 2017 WL 3674963, at *2. *Roskin-Frazee* also does not support Baylor's argument. There, the district court specifically distinguished the plaintiff's claims from the allegations Plaintiffs now raise against Baylor.[8]

---

[8] Distinguishing the claims in *Jane Doe 1, et al. v. Baylor Univ.*, 240 F. Supp. 3d 646, 662 (W.D. Tex 2017)—all of which Plaintiffs allege here—*Roskin-Frazee* explained: "*Doe 1* held that defendant created a 'heightened risk of sexual assault' by 'repeatedly misinform[ing] victims of sexual assault as to their rights under Title IX . . . fail[ing] to investigate reported sexual assaults . . . discourag[ing] those who reported sexual assaults from naming their assailants or otherwise coming forward[,]' and falsifying reports to the DOE regarding the number of sexual assaults on campus. Such allegations are not present here." *Roskin-Frazee*, at *6 (citing *Doe 1*, 240 F. Supp. 3d at 662) (internal citations omitted).

Further, the Court agrees with Plaintiffs that nothing in *Davis* requires an alleged assault to occur on campus in order for a defendant university to have "substantial control." (*See* Pl.'s Resp. Doe 12, Dkt. 25, at 9 n. 3). *Davis* stated: "Where misconduct occurs during school hours and on school grounds . . . the misconduct is taking place "under" an "operation" of the funding recipient," and "[i]n these circumstances, the recipient retains substantial control over the context in which the harassment occurs." *Davis*, 526 U.S. at 646. *Davis* concluded that substantial control was present on those facts because "the harasser is under the school's disciplinary authority." *Davis*, 526 U.S. at 646–47. So too here, Plaintiffs allege that Baylor's disciplinary measures were inadequate and intentionally discriminatory, causing a heightened risk of sexual assault for Baylor students.

Next, Baylor argues that universities are only liable for an "official policy" in the form of "a formal institutional decision . . . such as an admissions policy or [funding decision]." (*See* Def.'s Mot. Dismiss Doe 12, Dkt. 20, at 8). However, Baylor relies on Fifth Circuit authority that reaches no such conclusion. (*See id.* (citing *Pederson*, 213 F.3d at 882)). Rather than distinguishing athletic funding claims from sexual harassment claims, as Baylor incorrectly insinuates, *Pederson* distinguished institutional liability under Title IX from liability *not* based on an official policy, where a recipient of federal funds has actual notice of discrimination but responds with deliberate indifference. *See Pederson*, 213 F.3d at 882 (explaining that "school districts must themselves have actual discriminatory intent before they will be liable for the discriminatory acts of their employees," unless "it is the institution itself that is discriminating."); *see also Davis*, 526 U.S. at 641–42 ("'the receiving entity of federal funds [must have] notice that it will be liable for a monetary award . . . [but] this limitation on private damages actions is not a bar to liability where a funding recipient intentionally violates the statute.") (citations and internal quotations omitted).

Baylor contends that its written 2015–2016 Title IX policy, and "not employee violations of the policy," constituted Baylor's official policy at the time of the alleged assaults. (Def.'s Mot.

Dismiss Doe 12, Dkt. 20, at 8; Def.'s Mot. Dismiss Doe 14, Dkt. 22, at 7–10; Def.'s Mot. Dismiss Doe 15, Dkt. 23, at 8–9). Baylor asserts that finding liability based on "employee violations of the policy" would improperly allow liability for informal "custom," contrary to the language of Title IX. The Court rejects this argument for three reasons. First, this Court does not evaluate the plausibility of Plaintiff's claims based on "employee violations" of Baylor's written policy. The Supreme Court has considered and rejected respondeat superior liability for sexual harassment claims under Title IX. *Simpson*, 500 F.3d at 1175 (citing *Gebser*, 524 U.S. at 282). Second, the Supreme Court has analogized "official policy" liability under Title IX to municipal liability for a "policy or custom" under 42 U.S.C. § 1983. *See Gebser*, 524 U.S. at 291 (locating an analogue to the Title IX jurisprudence in the municipal liability doctrine); *see also Brown*, 520 U.S. at 403 (explaining that plaintiffs seeking to impose liability on a municipality under § 1983 must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury"). This Court will not disturb the Supreme Court's clear directive. Third, Baylor's dispute of which conduct constituted Baylor policy "demonstrate[s] a fundamental misunderstanding of the Plaintiff[s'] burden at the Motion to Dismiss stage." *Callaway v. City of Austin*, No. A-15-CV-00103-SS, 2015 WL 4323174, at *8 (W.D. Tex. July 14, 2015) (citing *Iqbal*, 556 U.S. at 678)). To survive a motion to dismiss, "Plaintiff[s'] factual allegations must rise to the level of *plausibility*, not certainty." *Id.* (emphasis in original). At this stage, the Court finds it plausible from the facts alleged that Baylor's practice of inadequately handling and even discouraging reports of peer sexual assault constituted an official policy.[9]

Plaintiffs allege that Baylor, "its staff, and highest officers," (Am. Compl., Dkt. 14, at ¶ 23), with knowledge of numerous and detailed reports of sexual assault, (*id.* ¶ 38), "maintained a set of

_____

[9] Baylor also argues that the university had no actual knowledge that a specific student or specific program or activity posed a substantial risk of sexual assault to Plaintiffs. (*See, e.g.*, Mot. Dismiss Doe 12, Dkt. 20, at 6). However, as detailed above, the Supreme Court has made clear that actual notice and deliberate indifference are not required showings in sexual harassment cases based on an official policy. (*See supra* at 19 (citing *Gebser*, 524 U.S. at 290; *Davis*, 526 U.S. at 642)).

policies, procedures, and customs . . . that were implemented in a sexually discriminatory manner," (*id.* ¶ 175), and "permitted a campus condition rife with sexual assault," (*id.* ¶ 23), that "substantially increased Plaintiffs' chances of being sexually assaulted," (*id.* at 1). Specifically, Plaintiffs allege that Baylor and its staff discouraged them from reporting her assault(s), (*id.* ¶¶ 55–57, 81, 111, 180), misled and lied to Plaintiffs about their options for reporting and accommodations under Title IX, (*id.* ¶¶ 40, 75, 81, 83, 111, 146–49), failed to adequately investigate reported sexual assaults, (*id.* ¶¶ 31–32, 68, 70, 83, 111–12, 147–48, 154–57, 180), and failed to take steps to ensure that students who did report would not be subjected to continuing assault and harassment, (*id.* ¶¶ 59, 68–70, 81, 84, 96, 111–12, 147–56). Additionally, despite being informed of multiple sexual assaults between 2008 and 2011, Baylor reported to the U.S. Department of Education that no such assaults took place on its campus during that period. (*Id.* ¶ 35). These alleged facts, construed as true, "raise a right to relief above the speculative level" that Baylor's policy or custom of inadequately handling and even discouraging reports of peer sexual assault constituted an official policy of discrimination that created a heightened risk of sexual assault, thereby inflicting the injury of which Plaintiffs complain.[10] *See Cuvillier*, 503 F.3d at 401 (citing *Twombly*, 550 U.S. at 555).

## IV. STATUTE OF LIMITATIONS

Having determined that Plaintiffs have adequately pleaded claims under Title IX, the Court will now consider whether any of Plaintiffs' claims are foreclosed by the applicable statute of limitations. "A motion to dismiss may be granted on a statute of limitations defense where it is evident from the pleadings that the action is time-barred, and the pleadings fail to raise some basis for tolling." *Taylor v. Bailey Tool Mfg. Co.*, 744 F.3d 944, 946 (5th Cir. 2014). While Title IX has no

---

[10] Because the Court finds that Plaintiffs have met their burden under the official-policy rubric, it does not evaluate this category of claims under the actual notice and deliberate indifference framework articulated in *Gebser* and *Davis*. However, Plaintiffs allege that Baylor knew of and permitted a "campus condition rife with sexual assault" and that its deliberate indifference to that condition increased Plaintiffs' chances of being sexually assaulted. (Am. Compl., Dkt. 14, at 1; *see also id.* ¶ 23). As such, the Court declines to find that Plaintiffs' heightened-risk claims would not be actionable under the approach detailed in *Gebser* and *Davis*.

express limitations period, the Fifth Circuit recently held that the two-year general personal injury limitations period set out in Section 16.003 of the Texas Civil Practice and Remedies Code applies to Title IX claims brought in Texas. *King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 759–61 (2015); Tex. Civ. Prac. & Rem. Code Ann. § 16.003.

"Absent tolling, the limitations period runs from the moment a plaintiff's claim 'accrues,'" and while the limitations period is borrowed from state law, "the particular accrual date of a federal cause of action is a matter of federal law." *King-White*, 803 F.3d at 762 (quoting *Frame v. City of Arlington*, 657 F.3d 215, 238 (5th Cir. 2011)). "[U]nder federal law, a claim accrues and the limitations period begins to run the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured." *Id.* (quoting *Spotts v. United States*, 613 F.3d 559, 574 (5th Cir. 2010)). "[A] plaintiff's awareness encompasses two elements: (1) The existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions." *Id.* (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 1995)). "'[A]wareness' [of the existence of the injury and causation] . . . does *not* mean actual knowledge; rather, all that must be shown is the existence of 'circumstances [that] would lead a reasonable person to investigate further.'" *Id.* (quoting *Piotrowski*, 237 F.3d at 576). Thus, for awareness of causation, a plaintiff "must have knowledge of facts that would lead a reasonable person (a) to conclude that there was a causal connection . . . or (b) to seek professional advice, and then, with that advice, to conclude that there was a causal connection between the [defendant's acts] and injury." *Harrison v. United States*, 708 F.2d 1023, 1027 (5th Cir. 1983).

With respect to Plaintiffs' heightened-risk claims, *see infra* Section III(B), Plaintiffs were aware of their injuries from the time the assaults occurred. Jane Doe 12, Jane Doe 14, and Jane Doe 15 each allege that they were sexually assaulted by another student at Baylor in 2016. (Am. Compl., Dkt. 14, ¶¶ 50, 106, 136). Jane Doe 13 alleges that she that she was sexually assaulted three times—

in April 2012, in Fall 2012, and during a study abroad program at some time before November 2014.[11] (*Id.* ¶¶ 78, 84, 96). Baylor moves to dismiss Jane Doe 13's claims as time-barred under the two-year statute of limitations. (Def.'s Mot. Dismiss Doe 13, Dkt. 21, at 11–18).  However, Jane Doe 13 contends she "had no notice of the Baylor's policies, procedures and customs that created the heightened risk environment until at least the [Pepper Hamilton Findings of Fact] were released." (Resp. Doe 13, Dkt. 26, at 12). Considering the same question in *Jane Doe 1, et al. v. Baylor Univ.*, this Court found it plausible that the plaintiffs in that case had no reason to further investigate their heightened-risk claims until the release of Baylor's Findings of Fact and the subsequent media coverage in 2016. *Doe 1*, 240 F. Supp. 3d at 663. The Court reaches the same conclusion here. Taking Plaintiffs' allegations as true, the claims for heightened-risk liability for all four Plaintiffs did not accrue until Spring 2016—or until the time of their assault, for Plaintiffs who were assaulted later. Accordingly, the two-year statute of limitations for Plaintiffs' heightened-risk claims had not run by September 1, 2017, when this case was first filed. (*See* Compl., Dkt. 1).

With respect to Plaintiffs' post-reporting claims, *see infra* Section III(A), the Court finds that Jane Doe 13's claims are time-barred, but all other Plaintiffs have filed their claim within the statute of limitations. All Plaintiffs allege they reported their sexual assault to Baylor personnel and that Baylor failed to adequately assist them, sometimes discouraging them from seeking further assistance. Because of this deliberately indifferent response, Plaintiffs allege, they were subjected to further harassment or assault or were otherwise deprived of educational opportunities to which they were entitled. Within some reasonable amount of time after their initial reports, Plaintiffs would have understood that Baylor's deliberate indifference to their reports was the cause of those post-

---

[11] Jane Doe 13 does not allege a date of the third assault. (*See* Am. Compl., Dkt. 14, at ¶ 96). As Baylor suggests in its Motion to Dismiss, (Mot. Dismiss Jane Doe 13, Dkt. 21, at 11 n.1), because Jane Doe 13 alleges that Baylor did not have a Title IX coordinator at the time of her assaults, and that Baylor hired a Title IX coordinator in November 2014, (Am. Compl., Dkt. 14, at ¶¶ 100, 42), the third assault must have taken place before November 2014. The Court adopts this analysis and assumes that the third assault took place no later than November 2014.

reporting injuries or could reasonably have been expected to "inquire further." *See King-White*, 803

F.3d at 761–63; *see also Samuelson v. Or. State Univ.*, 162 F. Supp. 3d 1123, 1127, 1134 (D. Or. 2016)

(finding that a plaintiff was time-barred from bringing a claim because she "learned of [the funding

recipient's] deliberate indifference to her report of rape when [the funding recipient] was in fact

deliberately indifferent to her own report of the assault").

Based on this understanding, the post-reporting claims of Does 12, 14, and 15 all fall within

the two-year statute of limitations window because each of the initial assaults or reports occurred

within two years of the filing of their claim.[12]

However, the post-reporting claims of Jane Doe 13 fall outside the statute of limitations. She

alleges that she was sexually assaulted by another student three times while she was a student at

Baylor: in April 2012, in Fall 2012, and during a study abroad program at some time before

November 2014.[13] (Am. Compl., Dkt. 14. ¶¶ 78, 84, 96). She alleges that she reported the first

assault to the Baylor Counseling Center in Fall 2012, and the second assault to her counselor at the

Counseling Center. (*Id.* ¶¶ 80, 86). She also reported one or more assaults to a professor in 2014. (*Id.*

¶ 91). Plaintiff does not state in the complaint whether she reported her third assault. (*See id.* ¶ 96).

However, Plaintiff's claim did not accrue until she was aware or had reason to know of Baylor's

deliberately indifferent response to these reports. It is unclear from the face of the Complaint when

this would have occurred. While it may have occurred in Fall 2012 following her first report,

depending on the content and timing of her communications with Baylor, it is also possible that her

claim did not accrue until later. However, even considering the latest date plausible on the face of

the Complaint—when she reported to her professor in 2014 and became aware that she received a

---

[12] Jane Doe 12, Jane Doe 14, and Jane Doe 15 each allege that they were sexually assaulted in 2016. (Am. Compl., Dkt. 14. ¶¶ 50, 106, 136). This case was first filed by Does 12, 13, and 14 on September 1, 2017. (*See* Compl., Dkt. 1). The amended complaint adding Jane Doe 15 was filed on February 28, 2018. (*See* Am. Compl., Dkt. 14).

[13] *See supra*, n. 11.

deliberately indifferent response—Jane Doe 13's post-reporting claim must have accrued at some time in 2014 or early 2015. Even allowing for an accrual of her claim in early 2015, the very latest plausible date, her two-year statute of limitations would have run by early 2017, before this case was filed on September 1, 2017. (*See* Compl., Dkt. 1).

Plaintiffs incorporate their arguments regarding tolling and the continuing violation doctrine from their submissions in *Jane Doe 1, et al. v. Baylor University*, Cause No. 6:16-cv-173. (*See* Resp. Doe 13, Dkt. 26, at 14). There, Plaintiffs argued the Court should toll the statute of limitations or apply the continuing violation doctrine to these claims.[14] However, the Court reaches the same conclusion in this case that neither tolling nor the continuing violation doctrine is applicable to Jane Doe 13's claims. First, tolling is unavailable to Plaintiffs under Texas law. Jane Doe 13 cannot take advantage of Texas' discovery rule because she have provided no explanation as to her their injuries were "inherently undiscoverable." *See King-White*, 803 F.3d at 764. Nor can she take advantage of the equitable tolling doctrines she invoke—fraudulent concealment and equitable estoppel—because, again, Plaintiffs have not alleged any facts from which the Court can reasonably infer that they could not have "discovered" their post-reporting causes of action in the exercise of due diligence. *See Owen v. King*, 111 S.W.2d 695, 697 (Tex. 1938).

Second, the continuing violation doctrine cannot extend the post-reporting claims of Jane Doe 13 because she has not pleaded facts to demonstrate any subsequent acts by Baylor which might extend the limitations period. *See, e.g., Messer v. Meno*, 130 F.3d 130, 134–35 (5th Cir. 1997) ("The continuing violation theory relieves a plaintiff of establishing that all of the complained-of conduct occurred within the actionable period if the plaintiff can show a series of related acts, one or more of which falls within the limitations period."). Jane Doe 13 states that she has delayed

---

[14] (*See, e.g.,* Resp. Mot. Dismiss Doe 5 (Dkt. 26, at 21–33), *Jane Doe 1, et al. v. Baylor University*, 240 F. Supp. 3d 646 (W.D. Tex. 2017) (No. 6:16-cv-173)).

graduation "for a full year," and "was set to graduate with her Masters in August of [2017]." [15] (Am. Compl., Dkt. 14, at ¶¶ 98–99). However, Jane Doe 13 does not allege facts indicating whether she remains enrolled at Baylor or was forced to leave. The latest date she specifies in the Amended Complaint is the report to her professor at some time in 2014. Without any facts for the Court to consider, the Court cannot find that a series of related acts extended the limitations period. Thus, even if the Court were to decide that the continuing violation doctrine applied[16] and that the doctrine extended Baylor's violation to the furthest imaginable reach, such as the date when a plaintiff left Baylor,[17] Jane Doe 13 has alleged no facts for the Court to make that determination. Accordingly, the Court must dismiss her post-reporting claims as time-barred.

## V. STATE LAW CLAIMS

In addition to their claims under Title IX, Plaintiffs also allege claims under Texas law for negligence and breach of contract. With the exception of two additional duties alleged, (*see* Am. Compl., Dkt. 14, ¶ 185(s)-(t)), Plaintiffs' submissions are identical to the state law claims that this Court dismissed for failure to state a claim in *Jane Doe 1, et al. v. Baylor University*, 240 F. Supp. 3d 646, 666–68 (W.D. Tex. 2017) (No. 6:16-cv-173).[18] The Court reaches the same conclusion for all state law claims raised here.

---

[15] Both the original Complaint and the Amended Complaint state: "Jane Doe 13 was set to graduate with her Masters in August of this year." (*See* Compl., Dkt. 1, at ¶ 97; Am. Compl., Dkt. 14, at ¶ 99). Because the original Complaint was filed in 2017, and the Amended Complaint was filed in 2018 but did not revise this language, the Court construes this submission to mean that Jane Doe 13 was scheduled to graduate in August of 2017.

[16] The continuing violation doctrine "typically arises in the context of [Title VII] employment discrimination," *Frame v. City of Arlington*, 575 F.3d 432, 438 (5th Cir. 2009), and the Fifth Circuit has cautioned courts to be wary of using it in other contexts. *McGregor v. La. State Univ. Bd. of Supervisors*, 3 F.3d 850, 866 n.27 (5th Cir. 1993).

[17] To be clear, the Court does not reach a decision on whether the continuing violation doctrine applies in Title IX cases and, more importantly, does not intend to imply that this would be the doctrine's reach were it to apply.

[18] The Plaintiffs adopt and incorporate their submissions in that case regarding their state law claims. (*See* Resp. Doe 13, Dkt. 26, at 14).

### A. Negligence Claims

Plaintiffs allege that Baylor "owed Plaintiff[s] a duty of reasonable care" and that it "breached these duties in multiple ways." (Am. Compl., Dkt. 14, ¶¶ 184–85). Plaintiffs allege Baylor breached numerous duties, which fall into three primary categories: (1) Baylor's duty to protect Plaintiffs from the criminal acts of others to the extent those acts were foreseeable, (2) Baylor's duty to adequately hire, train, and supervise its employees regarding how to properly handle reports of sexual assault, and (3) Baylor's other duties of care. The Court addresses Plaintiffs' theories below.

### 1. Duty to Protect From Foreseeable Criminal Acts

The Court's jurisdiction over Plaintiffs' state law claims is supplemental to its federal question jurisdiction. 28 U.S.C. § 1367(a). A federal court exercising supplemental jurisdiction over state law claims must apply the substantive law of the state in which it sits. *Sommers Drug Stores Co. Empl. Profit Sharing Tr.*, 883 F.2d 345, 353 (5th Cir. 1989) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 (1938)). As a result, this Court must apply Texas law to Plaintiffs' state law claims. In resolving issues of Texas state law, federal courts look to decisions of the Texas Supreme Court. *Hux v. S. Methodist Univ.*, 819 F.3d 776, 780 (5th Cir. 2016). If that court has not ruled on the issue, the federal court must make what is known as an "Erie guess"—that is, it must predict what the Texas Supreme Court would do if faced with the facts currently before the federal court. *Id.* Generally, state intermediate courts' decisions are the strongest indicator of what a state supreme court would do. *Id.* at 780–81.

In Texas negligence law, liability "is premised on duty, a breach of which proximately causes injuries, and damages resulting from that breach." *Thapar v. Zezulka*, 994 S.W.2d 635, 637 (Tex. 1999). Whether a legal duty exists is therefore a threshold question; if there is no duty, there can be no liability. *Id.* As a general matter, there is no duty to control the conduct of third persons. *See Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). However, that general rule does

not apply when a special relationship exists between the actor and the third person that imposes a duty on the actor to control the third person's conduct. *Id.* Such special relationships traditionally include those between an employer and employee or between a parent and child. *Id.*

Plaintiffs argued in *Doe 1* that Baylor had a special relationship with its students because "[o]ne who controls [a] premises . . . [has] a duty to use ordinary care to protect invitees from criminal acts of third parties if he knows or has reason to know of an unreasonable and foreseeable risk of harm to the invitee." *Lefmark Mgmt. Co. v. Old*, 946 S.W.2d 52, 54 (Tex. 1997). "This duty . . . is commensurate with the right of control over the property." *Id.* at 53–54; *see also Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 21 (Tex. 1993) ("In the landlord-tenant relationship, a duty to the tenant also attaches when the landlord has the right of control over the leased premises."). *See Doe 1*, 240 F. Supp. 3d, at 666.

As this Court explained in *Doe 1*, the Texas Supreme Court, while noting that universities may be held liable for negligent failure to protect in some circumstances, has not specifically addressed the special relationship doctrine in the context of students and universities. *See generally Delaney v. Univ. of Houston*, 835 S.W.2d 56 (Tex. 1992) (reversing a trial court's grant of summary judgment to a college and leaving open the possibility that the university could be liable for failing to replace defective locks on the doors of a dormitory, thereby enabling an intruder to enter and sexually assault a student). Intermediate Texas courts have declined to hold that the relationship between a private university and its adult students constitutes a special relationship, *see Boyd v. Tex. Christian Univ., Inc.*, 8 S.W.3d 758, 760 (Tex. App.—Fort Worth 1999, no writ), as have most courts surveying state law on this issue, *see, e.g., Freeman v. Busch*, 349 F.3d 582, 587–88 (8th Cir. 2003) ("[S]ince the late 1970s, the general rule is that no special relationship exists between a college and its own students because a college is not an insurer of the safety of its students.").

While the Court appreciates Plaintiffs' submissions, the Court is bound to follow state negligence law in evaluating Plaintiffs' claims under the duty-to-protect doctrine. Jane Doe 12 and Jane Doe 15 do not specify the location of their assaults. (Am. Compl., Dkt. 14, ¶¶ 50, 136).  Jane Doe 13 only specifies the location of her third sexual assault, which took place on a Baylor study abroad program. (*Id.* ¶¶ 78, 84, 96).  Jane Doe 14 alleges that she was assaulted in student housing owned by Baylor.  (*Id.* ¶ 109). While Does 13 and 14 allege they were sexually assaulted on Baylor's campus or in the context of a Baylor-operated program, they have not alleged that Baylor failed to meet its duty to provide them with safe housing, thereby causing their assaults, nor have they provided any other exception to the general rule that a university has no duty to protect its students. As to Jane Doe 12 and Jane Doe 15, a Texas Court of Appeals has already specifically considered and rejected the proposition that universities have a duty to protect adult students from the criminal acts of other students while off-campus. *See Boyd*, 8 S.W.3d at 760. Accordingly, Baylor's motion to dismiss any of Plaintiffs' claims predicated on the theory that Baylor breached its duty to protect Plaintiffs from the criminal acts of other students is granted.

## 2. Duty to Adequately Hire, Train, and Supervise Employees

Next, Plaintiffs argue that Baylor breached its duty, as an employer, to adequately hire, train, and supervise employees. While Plaintiffs are correct that such a duty exists in the general sense, *e.g.*, *Castillo v. Gared, Inc.*, 1 S.W.3d 781, 786 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) ("An employer has a duty to adequately hire, train, and supervise employees."), they fail to identify how Baylor breached this duty. For example, in order to establish a claim for negligent hiring, a plaintiff must demonstrate that there is "[some]thing in the employee's background that would cause a reasonable employer not to hire or retain the employee." *Dangerfield v. Ormsby*, 264 S.W.3d 904, 912 (Tex. App. 2008). And "[t]o establish a claim for negligent training, a plaintiff must prove that a reasonably prudent employer would have provided training beyond that which was given and that

failure to do so caused his injuries." *Id.* Plaintiffs have argued neither that Baylor failed to meet the standard of care for universities in hiring, training, and supervising employees nor that that such a standard extends to how employees handle reports of sexual assault. The Court therefore grants Baylor's motion to dismiss Plaintiffs' claims for negligence to the extent they are premised on Baylor's breach of a duty to hire, train, or supervise its employees.

### 3. Other Duties

Plaintiffs argue that Baylor breached a number of other alleged duties of reasonable care. For example, they allege Baylor breached a duty of reasonable care by failing to adopt sexual education programs to promote awareness of rape, acquaintance rape, and other sex crimes, and by failing to adopt and enforce procedures for students to follow should they be sexually assaulted. (Am. Compl., Dkt. 14, ¶ 185(j), (l)). They also argue that Baylor breached a reasonable duty of care by failing to provide meaningful assistance and accommodation for victims of sexual assault, and by failing to ensure student conduct rules were enforced in a way that was not sexually discriminatory. (*Id.* ¶ 185(s)–(t)).

While the Court appreciates Plaintiffs' submissions, Plaintiffs have not identified any legal basis for the argument that these actions were required under any standard of reasonable care applicable to Baylor under state law. *Cf. Hux*, 819 F.3d at 783 (applying Texas law and holding that no special relationship giving rise to a duty existed in an "ordinary student-administrator relationship," even where a university "[e]ncourag[ed] students to take advantage of university mental-health resources, counsel[ed] students, and offer[ed] help to students struggling through disciplinary problems"). The Court therefore grants Baylor's motion to dismiss Plaintiffs' remaining negligence claims.

## B. Breach of Contract

Finally, Plaintiffs also allege they had "valid enforceable contracts with [Baylor] as academic enrollees and also as residents living in on-campus housing," that Baylor breached these contracts by failing to adequately warn Plaintiffs of the risk of sexual assault on campus and by failing to provide an adequately safe living and educational environment, and that Plaintiffs suffered foreseeable damages as a result of these breaches. (Am. Compl., Dkt. 14, ¶¶ 188–91). Baylor responds that Plaintiffs failed to identify an enforceable contract or to identify the specific provisions of the purported contract which were allegedly breached. (Def.'s Mot. Dismiss Doe 12, Dkt. 20, at 19–20; Def.'s Mot. Dismiss Doe 12, Dkt. 21, at 19–20; Def.'s Mot. Dismiss Doe 14, Dkt. 22, at 19–20; Def.'s Mot. Dismiss Doe 15, Dkt. 23, at 20).

The Court agrees that Plaintiffs do not adequately allege breach of contract. "A breach of contract . . . only occurs when a party fails or refuses to perform an act that it expressly promised to do." *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 995 F. Supp. 2d 587, 602 (N.D. Tex. 2014). Thus, "[t]o plead a breach of contract claim, a plaintiff must identify a specific provision of the contract that was allegedly breached." *Id.* Here, Plaintiffs allege Baylor breached the purported contract[19] by (1) failing to adequately warn students of the high risk of sexual assault on campus, and (2) failing to provide Plaintiffs with an adequately safe living and educational environment. (Am. Compl., Dkt. 14, ¶¶ 189–90). But Plaintiffs do not identify the terms or obligations of the purportedly breached contract, nor do they suggest what document or documents comprise that contract. Without these factual allegations, Plaintiffs' breach of contract claim does

---

[19] Under Texas law, "a school's catalog constitutes a written contract between the educational institution and the student where the student entered the institution under the catalog's terms." *Alcorn v. Vaksman*, 877 S.W.2d 390, 403 (Tex. App.—Houston [1st Dist.] 1994, writ denied). Some Texas courts have also suggested that documents outside of the course catalog may constitute this written contract. *Southwell v. Univ. of Incarnate Word*, 974 S.W.2d 351, 356 (Tex. App.—San Antonio 1998, writ denied) ("[I]n the absence of a binding catalog, the student agrees that those terms are subject to change throughout the course of his or her education."). It remains unclear, however, whether a student may have a cause of action for breach of contract when a school fails to provide benefits other than those explicitly named in the catalog or other documents.

not provide Baylor with the fair notice of their claim required by Federal Rule of Civil Procedure 8. *See Twombly*, 550 U.S. at 555. Baylor's motion to dismiss Plaintiffs' breach of contract claims is therefore granted.

## V. CONCLUSION

For the foregoing reasons, the court hereby **ORDERS** that Baylor's motions to dismiss, (Dkts. 20, 21, 22, and 23) are **GRANTED IN PART** and **DENIED IN PART**, consistent with the terms of this Order. Specifically:

- Baylor's motions to dismiss Plaintiffs' heightened-risk claims are **DENIED** as to all Plaintiffs.

- Baylor's motions to dismiss Plaintiffs' post-reporting claims are **DENIED** as to Jane Doe 12, 14, and 15, and **GRANTED** as to Jane Doe 13.

- Baylor's motions to dismiss Plaintiffs' state-law claims are **GRANTED** as to all Plaintiffs.

**SIGNED** on September 29, 2018.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE